# REDACTED OPINION

# In the United States Court of Federal Claims

### No. 14-234C
### Filed: July 11, 2014
### Redacted Version Issued for Publication: August 13, 2014[1]

```
* * * * * * * * * * * * *   *
OCTO CONSULTING GROUP, INC.  *
                             *                Bid Protest; Motion for Judgment
                 Protestor,  *                on the Administrative Record;
            v.               *                General Services Administration;
                             *                Technical Evaluation; Best Value.
UNITED STATES,               *
                             *
                 Defendant.  *
                             *
* * * * * * * * * * * * *   *
```

**John R. Tolle**, Barton, Baker, Thomas and Tolle, LLP, McLean, Virginia, for protestor.

**P. Davis Oliver**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Reginald T. Blades, Jr.**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Stuart F. Delery**, Assistant Attorney General.

# O P I N I O N

## HORN, J.

The protestor, Octo Consulting Group, Inc. (Octo), filed a bid protest in this court challenging the General Services Administration's (GSA's) awards of contracts to 43 awardees under Pool 3 of the OASIS SB (One Acquisition Solution for Integrated Service—Small Business) request for proposals No. GS00Q-13-DR-0002 (the Solicitation). Protestor alleges that the "Agency [GSA] improperly failed to award Octo a contract," because "either the Agency improperly rated its proposal or Octo's original self-assessment was incorrect." Protestor also alleges that "[e]ven if the Agency did properly determine Octo's score, based upon the mistakes that Octo discovered the Agency made in evaluating its proposal, the Agency probably improperly evaluated the

---

[1] This opinion was issued under seal on July 11, 2014. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with the redactions that the parties proposed in response to the court's request. Where words have been redacted, it is reflected with the following notation: "[redacted]."

proposals of some of the 43 awardees." Therefore, protestor sought an order declaring that the Agency's actions in evaluating Octo's proposal were "irrationally based, arbitrary, capricious, and contrary to applicable statutes and regulations." The protestor also sought a preliminary injunction, followed by a permanent injunction, to enjoin the Agency from proceeding on the Pool 3 contracts and to properly evaluate Octo's proposal. The court issued an oral ruling to the parties denying protestor's motion for injunctive relief. This opinion reduces to writing and further explains the prior oral decision delivered to the parties.

## FINDINGS OF FACT

On July 30, 2013, GSA issued an Acquisition Plan, which identified "a significant need for a contract vehicle" that could "provide total solutions for complex professional service based requirements that spans multiple service disciplines within the government marketplace." The Agency intended for the OASIS SB to provide both commercial and noncommercial services and to "meet the professional service mission requirements of all Federal agencies, including all organizations within the Department of Defense (DoD)."

The following day, July 31, 2013, the Agency issued the Solicitation. The Solicitation was a 100% small business set-aside contract, and stated the

OASIS SB spans 28 NAICS [North American Industry Classification System] Codes and 6 NAICS Code Exceptions under the economic subsector 541, Professional, Scientific, and Technical Services. NAICS Codes are grouped into 6 separate size standards (14M, 19M, 35.5M, 500 employees, 1,000 employees, and 1,500 employees) and are referred to as 'Pools'. Pool 5 (1,000 employees) will be split into Pool A (Exception B) and Pool B (Exception C) for a total of 7 Pools. Each Pool will be a separate OASIS SB MA-IDIQ task order contract.  Multiple awards shall be made in each of the 7 Pools. 40 awards are anticipated in each Pool (e.g., 40 multiple awards for Pools 1,2,3,4, and 6) and (20 multiple awards for Pools 5.A. and 20 multiple awards for 5.B.). In the event of a tie at the number 40/20 position (as applicable), all Offerors tied will receive an award in the respective Pool.

The Solicitation also noted "[a] single Offeror may compete for more than one OASIS SB Pool." As indicated in the Solicitation, "[t]he period of performance of OASIS SB is from the date of the Notice-To-Proceed through 5 years thereafter, with 1 (5-year) option that may extend the cumulative term of the contract to 10 years in accordance with FAR 52.217-9, Option to Extend the Term of the Contact, if exercised."

As indicated in the Joint Stipulations of Fact submitted by the parties: "From a technical perspective, the Government sought to measure what work an offerors [sic] had actually done, what systems and certifications an offeror actually obtained, and how well an offeror had performed."  (internal citations omitted).

The "BASIS FOR AWARDS" (capitalization in original), at Section M.2. of the Solicitation indicated that:

> The source selection process on OASIS SB will neither be based on the Lowest Price Technically Acceptable (LPTA) nor Tradeoffs. Within the best value continuum, FAR 15.101 defines best value as using any one or a combination of source selection approaches. For OASIS SB, the best value basis for awards will be determined by the Highest Technically Rated Offerors with a Fair and Reasonable Price.

The Solicitation indicated that the Highest Technically Rated, Fair and Reasonable Price approach would "best achieve the objective of awarding contracts to Offerors of varying core expertise in a variety of professional services disciplines with qualities that are most important to GSA and our customers, such as Past Performance, Relevant Experience, and Systems, Certifications, and Clearances." The Solicitation also indicated that "[t]he Government intends to award contracts without discussions. Initial proposals must contain the best offer. The Government may conduct clarifications, as described in FAR 15.306(a). The Government reserves the right to conduct discussions if determined necessary." The Solicitation noted that "[c]larifications may be conducted for better understanding of proposal contents, but Offerors will NOT be able to change their proposals based upon any clarifications." (capitalization in original).

The Source Selection Plan expanded on the Solicitation's "BASIS FOR AWARDS," (capitalization in original), and explained:

> Work to be performed under OASIS SB are articulated and awarded by federal customers at the task order level. As a result, non-price factors like Past Performance, Relevant Experience, and Systems, Certifications, and Clearances play a dominant role in the basis for the OASIS SB awards. Accordingly, the source selection process will neither be based on the Lowest Price Technically Acceptable (LPTA) or Tradeoffs. The LPTA approach is in direct contrast and detrimental to obtaining the quality and expertise of professional service employees needed for successful task order performance across the federal Government for a variety of integrated professional services for all contract types and pricing. Tradeoffs allow for a subjective analysis to consider awards to other than the lowest priced Offeror or other than the highest technically rated Offeror, however, this subjective approach is better suited for single award contracts or task orders when risks associated with the actual work to be performed and actual prices to be paid are being analyzed. Furthermore, in a tradeoff scenario, you can't predetermine a number of awards because you don't know in advance where the logical trade-offs will occur.

> Given the breadth and depth of OASIS SB a more "Objective" approach rather than a "Subjective" approach will be used for the basis of awards, focusing primarily on the non-price factors. Within the best value

3

continuum, FAR 15.101 defines best value as using any one or a "combination" of source selection approaches. As the best value continuum points out, technical capability becomes a more dominant factor in procurements where the requirement is not definitive and contract type and pricing is accomplished at the task order level.

For OASIS SB, the best value basis for award will be determined by the Highest Technically Rated (HTR) Offerors with Fair and Reasonable Pricing.

(all emphasis in original).

Proposals to the Solicitation were due by October 10, 2013.[2] Proposals were to have 6 volumes: Volume 1 (General); Volume 2 (Responsibility); Volume 3 (Relevant Experience); Volume 4 (Past Performance); Volume 5 (Systems, Certifications, and Clearances); and Volume 6 (Cost/Price).  The Solicitation provided that "[t]he OASIS SB evaluation team will perform a two-step screening process for all offers received," first verifying that supporting documentation exists for all evaluation elements in accordance with the offeror's proposal checklist, and second comparing the checklist to the offeror's self-scoring worksheet. The proposal checklist asked offerors to identify the documents they submitted in connection with Volumes 1 through 6 of their proposal. The self-scoring worksheet permitted offerors to calculate points to which they believed they are entitled based upon the Scoring Table included in the Solicitation. The Scoring Table provided that an offeror could achieve a maximum number of 4,000 points for Relevant Experience (Volume 3), 4,000 points for Past Performance (Volume 4), and 2,000 points for Systems, Certifications, and Clearances (Volume 5), allowing for a maximum potential score of 10,000 points.[3]

Once the initial screening process was complete, the evaluation team assigned a preliminary score for all offers in accordance with the Solicitation's Scoring Table. As indicated in the Solicitation, "[t]he OASIS SB evaluation team will then <u>verify</u> that Top 40 awards for Pools 1,2,3,4, and 6 and the Top 20 awards for Pools 5.A. and 5.B. have

---

[2] Both the Solicitation and the Joint Stipulations of Fact state that proposals to the Solicitation were due by October 10, 2013. The Source Selection Plan, however, indicates that "[t]he final solicitation was issued on July 31, 2013 with a closing date of October 30, 2013," and Octo's proposal was dated October 30, 2013.

[3] At oral argument defendant's counsel indicated that "the solicitation places the responsibility on the offerors to look at their proposal at the very beginning and make sure that they claim all the points to which they think they're entitled. In fact, the incentive is for offerors to do that. And that's why comically you have some offerors here who claimed 12,000 points out of 10,000. . . ."

successfully passed all of the Acceptability Review requirements in Section M.4. of the solicitation."[4] (emphasis in original). The Solicitation continued:

> Any Offeror in the Top 40 and/or Top 20 based upon score, who fails any of the criteria listed in the Acceptability Review in Section M.4., will be removed from consideration for award and notified, in writing, as soon as practicable. The next highest rated Offeror(s) (based upon score) who passes the Acceptability Review shall be added in the eliminated Offerors place. Only Offerors who initially pass all the criteria in the Acceptability Review in a given Pool in accordance with Section M.4. shall be considered eligible for award.

> Following the Acceptability Review screening, the evaluation team will then evaluate and verify the support documentation for each and every evaluation element that the Top 40 and/or Top 20 have stated in the Offeror's proposal checklist (Section J.4.) and self scoring worksheet (See Section J.5A.)

> In the event that an evaluation element claimed is unsubstantiated or otherwise not given credit for, the Offeror's preliminary score shall have the point value of the refuted evaluation element deducted and the Offeror will be re-sorted based upon the revised preliminary score. If the Offeror remains in the Top 40 and/or Top 20 the evaluation of the offer shall continue. If the Offeror does not remain in the Top 40 and/or Top 20, the next highest rated Offeror (based upon score) who passes the Acceptability Review shall be added to the Top 40 and/or Top 20 and evaluation shall begin on that offer.

> Once the Top 40 and/or Top 20 highest scored offers have been evaluated and validated, the evaluation team will then check to verify that these Offerors have proposed fair and reasonable pricing. In the event that an Offeror has not provided fair and reasonable pricing, the Offeror shall be eliminated from further consideration for award unless discussions are conducted. However, the OASIS SB CO plans on basing award on initial proposals and does not intend on conducting discussions as stated in Section M.2.

> The evaluation process shall continue this cycle until the Top 40 and/or Top 20 apparent successful Offerors are identified in each OASIS SB Pool that represent the highest technically rated offers (based on scores) with a fair and reasonable price. In the event of a tie at the position of number 40 and/or 20, all Offerors tied for this position shall receive a contract award.

---

[4] The requirements for the Acceptability Review varied for each Volume, but generally required that "[t]he Offeror must ensure all the requested proposal submission information is current, accurate, and complete. . . ."

(emphasis in original).

In articulating the evaluation standards in the Solicitation, the Source Selection Plan indicated that the evaluation team "will strive to insure that all Offerors are evaluated on a consistent basis," and indicated that "[t]he OET [evaluation team] will not gather information for Offerors. Offerors are required to submit complete and comprehensive offers that meet the requirements of the solicitation," and the evaluation team will assume that the offeror has claimed all proper points in its self-scoring worksheet. As noted in the Joint Stipulations of Fact:

> Adjustments to the self-score will generally be deductions (if applicable) except in cases where it is clear that (1) an error was made in the self-scoring worksheet (an item not claimed in the self-scoring worksheet, but was claimed in the proposal checklist, or the Relevant Experience Worksheets); (2) a calculation error was made (e.g., annual value, past performance scoring); (3) the examination of the CPARS [Contractor Performance Assessment Reporting System] records reveals a higher score than claimed; or (4) the examination of the FPDS [Federal Procurement Data System] reveals a NAICS or PSC [Product Service Code] code that was not claimed for a given project.

As also noted in the Joint Stipulations of Fact, "[f]or an offeror to be eligible for consideration under a given pool, the offeror must have performed two 'pool qualification' projects under a NAICS Code or NAICS Code Exception or Product Service Code (PSC) that corresponds directly to a NAICS Code or NAICS Code Exception in the Pool being applied for."

The Solicitation indicated that "[t]o be eligible to compete for Pool 3 [the pool to which Octo applied] the offeror must identify <u>any **Two (2)**</u> projects that have NAICS Code 541330 or PSC Code R425 assigned to them and provide verification documentation for Exceptions on each project." (emphasis in original). The Solicitation describes the relevant NAICS Code Exceptions for Pool 3 as follows:

| NAICS CODE | NAICS TITLE |
|---|---|
| 541330<br>Exception A | Engineering for Military and Aerospace Equipment and Military Weapons |
| 541330<br>Exception B | Engineering for Contracts and Subcontracts for Engineering Services Awarded Under the National Energy Policy Act |
| 541330 | |

Exception C                    Engineering for Marine Engineering and Naval
                               Architecture

**PSC CODE**                   **DESCRIPTION**

R425                           Support-Professional: Engineering/Technical
                               Includes: Systems Engineering, Technical Assistance,
                               and Other Services Used to Support The Program
                               Office During The Acquisition Cycle

For past performance, an offeror could receive more points based on various factors, including,

whether the projects have any reported NAICS Code or PSC Code that correlates to the NAICS/PSC Code Table in Section L.5.1.2 of the solicitation; (2) if the annual value of the projects exceed certain thresholds; (3) whether the projects involve performance and or integration of at least four out of the six of the Core Disciplines; (4) whether the project involves performance in multiple locations; (5), whether the project involves subcontracting/teaming for services with at least three separate and distinct entities; (6) if the project involves "Ancillary Support Service and or Products;" (7) if the projects are cost-reimbursement; (8) if the projects involve work at a location Outside the United States (OCONUS).

Octo submitted its proposal to Pool 3 on October 30, 2013, with a reported self-score of 5,875. Octo's self-reported score was initially considered amongst the highest technically rated proposals, placing it in the Top 40 proposals for Pool 3. In accordance with the Solicitation, the evaluation team evaluated the proposal's technical score. Upon evaluation, however, the Agency deducted 100 points from Octo's past performance, lowering Octo's score to 5,775, and placing Octo outside the top 40 proposals. The Agency's evaluation of Octo's past performance score adjustments were:

| Past Performance Project | Past Performance Rating/Score | Points claimed by Octo | Deductions |
|---|---|---|---|
| Project #1 | 4.4 rating/600 points | 700 points | (-100) |
| Project #2 | 4.4 rating/600 points | 800 points | (-200) |
| Project #5 | 5.0 rating/800 points | 600 points | +200 |
| **Total** | | | -100 |

Thereafter, the Agency made awards pursuant to the Solicitation.  For Pool 3, the Agency received 100 offerors and made 43 awards.[5] Octo did not receive an award. On February 24, 2014, Oasis received an Unsuccessful Offeror Notification and Post Award Debriefing Letter from the Agency, signed by the contracting officer, Tommy G. Thomas.  The debriefing letter explained:

> The source selection methodology for this procurement, as stated in the solicitation, is Highest Technically Rated with Fair and Reasonable Pricing. Based upon the self-score in the J.5 of your proposal submission, your offer was initially considered amongst the highest technically rated. However, once the contents of your offer were evaluated and adjustments were made to your proposal's technical score, your offer was no longer considered amongst the highest technically rated offers.

The debriefing letter noted that Octo's self-score was 5,875, but indicated that the evaluated score was 5,625. The debriefing letter also indicated that "[t]he overall technical ranking of your offer (after evaluations)" was 50th out of 100 within the Pool 3 applicants. The parties have stipulated that the Agency incorrectly indicated Octo's evaluated score was 5,625, and Octo's evaluated score should have been listed as 5,775.  An evaluated score of 5,775 would still have been below the lowest evaluated technical score for an offeror eligible to receive a contract award.

---

[5] As noted in the Joint Stipulations of Fact, "[t]he awardees consisted of the Top 40 and three companies which were included as awardees due to their socio-economic status." As explained in the Solicitation:

> The Government will examine the Top 40 and/or Top 20 highest technically rated Offerors within each Pool to determine how many of those Offerors certify as being HUBZone, SDVOSB [Small Disadvantaged Veteran-Owned Small Businesses], WOSB [Women-Owned Small Businesses], EDWOSB [Economically Disadvantaged Women-Owned Small Businesses], and/or 8(a). If at least three representatives are present for each socio-economic sub-group, no additional awards shall be made. In the event that any particular socio-economic sub-group does not have at least three representatives in a given Pool, the Government will award to the next highest rated Offeror eligible for award (in addition to the Top 40 and/or Top 20 highest technically rated Offerors) within a given socio-economic sub-group until each socio-economic sub-group has three representatives.

For the entire Oasis SB there were a total of 330 proposals, there were 125 awardees.

8

The debriefing letter explained that:

Since your offer was not one of the highest technically rated after technical evaluation, evaluation of your submitted pricing was not applicable because the technical score and rank did not merit further evaluation.

**Summary of Rationale for Award**: Awards were made to the highest technically rated Offerors with fair and reasonable pricing in accordance with the solicitation. The number of awards made is consistent with the terms of the solicitation. Your evaluated technical score was 5,625. The lowest evaluated technical score for contract winners in the OASIS SB Pools are:

Pool 3: 5,875

Because your evaluated technical score was lower than the lowest evaluated technical score of all contract awardees, your proposal could not be considered for award.

(emphasis in original).

Following receipt of the debriefing letter, Octo re-examined the documentation submitted with its original proposal and in a March 5, 2014 letter to the Agency, identified areas regarding which the protestor thought the Agency had improperly rated its proposal. In the March 5, 2014 letter to the Agency, Octo indicated that only 100 points should have been deducted for past performance. The March 5, 2014 letter also indicated that, "[s]ince the original proposal submission, Octo has been assessed at CMMI [Capability Maturity Model Integration] Level 3 maturity as found on the CMMI Institute website." Octo, therefore, argued to the Agency, "[w]e believe this increase in CMMI maturity level entitles Octo to 100 additional points in our evaluated score."

That same day, March 5, 2014, the Agency responded to Octo and agreed that the debriefing letter incorrectly calculated Octo's past performance score, and notified Octo that 150 points has been added to its evaluated score. The Agency, however, declined to award any additional points for events occurring after the proposal was submitted. Subsequently, in a March 12, 2014 letter, Octo indicated to the Agency that Octo had re-examined the documentation submitted with its original proposal and had identified additional areas regarding which it believed its original self-assessment was incorrect, specifically regarding Volume 3 - Relevant Experience of its proposal. In its March 12, 2014 letter, Octo claimed that "GSA's letter dated March 5, 2014 determined a corrected Octo total score of 5,775 points.  The additional points resulting from Octo's corrected self-assessment (as summarized below) raise Octo's point total to 6,025." Octo indicated in the March 12, 2014 letter:

**OASIS Scoring Summary for Octo**

| | |
|---|---|
| GSA Evaluated Score | 5,775 |
| Octo Self-Assessment Correction to P2E Project Value | +25 points |
| Octo Self-Assessment Correction to Mission Spaces | -50 points |
| Octo Self-Assessment Correction to Core Disciplines | <u>+ 275 points</u> |
| **Corrected Octo Self-Assessment Score** | **6,025 points** |

(emphasis in original).

In a March 13, 2014 email, Todd Richards, the Agency's lead evaluator for the OASIS SB procurement, explained, on behalf of the contracting officer, that the Agency could not permit Octo's additional, proposal adjustments:

> If we allowed you to amend your J.5 document, this would constitute "discussions". Since we did not conduct discussions as part of this evaluation process, to allow you to amend your proposal submission would be a violation of regulation and jeopardize the integrity of our evaluation.   Generally speaking, the Offeror is responsible for the accuracy of submitted proposal documents, not the Government. Furthermore, Offerors are not entitled to discussions. Accordingly, while we can examine any evaluation adjustments we made to your self-score as part of a clarification process, you may not change or amend the proposal documentation submitted unless discussions are conducted.

The e-mail concludes:

> We sincerely hope that this helps clarify your understanding of the process and the situation. While you may pursue any legal redress you feel necessary, we hope you will realize that the OCTO offer has been treated fairly and we have performed the evaluations precisely how we said we would in the solicitation. Accordingly, any legal redress is likely to be futile.

> We feel we've conducted a very transparent procurement and evaluation process. While OCTO may not have been successful this time, there will be on-ramps in the future that OCTO will likely be competitive for. We wish you nothing but the best of luck in the future.

Subsequently, protestor filed a bid protest complaint in this court alleging that the Agency improperly failed to evaluate and award Octo a contract, based on the government's improper evaluations. The complaint also alleges that

[e]ven if the Agency did properly determine Octo's score, based upon the mistakes that Octo discovered the Agency made in evaluating its proposal, the Agency probably improperly evaluated the proposals of some of the 43 awardees.  The evaluation methodology is complex and the self-scoring spreadsheet lacked mathematical checks to prevent offerors and GSA from making errors.

Protestor sought an Order declaring the Agency's actions when evaluating Octo's proposal "irrationally based, arbitrary, capricious, and contrary to applicable statutes and regulations." The protestor also sought

a preliminary injunction, followed by a permanent injunction, to (a) require the Agency to properly evaluate Octo's proposal and (b) enjoin the Agency, its officers, agents and employees, and all other persons in active concert or participation with them, from proceeding with any activities relating to the award of or administration of contracts under Pool 3 of the RFP [Request for Proposals] until this proceeding is complete.[6]

After briefing by the parties and oral argument, Todd Richards, the Agency's Lead Evaluator for the Oasis SB procurement, submitted an uncontested,[7] sworn affidavit to the court.  As indicated in Mr. Richards' affidavit:

At the request of counsel for the Government, I conducted an evaluation of Volume Three of Octo Consulting Inc.'s (Octo) proposal, entitled Relevant Experience, for the purpose of determining whether the points that Octo claimed for Relevant Experience were substantiated by documentation.  Prior to this request, GSA had not conducted an evaluation of Volume Three (Relevant Experience) because Octo dropped out of the Top 40 following the evaluation of its past performance. Under the solicitation, the evaluation process ceases for offerors who fall out of the Top 40 due to point deductions.

Mr. Richards concluded: "My evaluation of Octo's Relevant Experience, as discussed below, reveals that there are a host of deductions that I would have made, totaling 500 points, due to Octo's claims with respect to having performance in multiple locations and outside the United States (OCONUS) that are not substantiated by documentation." Mr. Richards provided a narrative explanation of each of the deductions, as well as the following chart identifying protestor's claims and the reason for the deductions:

---

[6] Although Octo did not file a protest at the United States Government Accountability Office (GAO), Pool 3 was protested at the GAO by other offerors.

[7] In a May 9, 2014 filing, protestor indicated that "Plaintiff Octo Consulting Group, Inc. has no objections to the contracting officer's affidavit. . . ."

| Project | Octo's Claim | Applicable Deduction |
|---|---|---|
| [redacted] | 100 points for having performance in 5 different locations | 100 points<br>> Ft. Belvoir and McLean, VA are both in Fairfax County (same MSA [Metropolitan Statistical Area] Code)<br>> TDY [Travel Duty] assignments to Illinois, Germany, Arizona, and South Korea do not count under solicitation |
| [redacted] | 100 points for having performance OCONUS | 100 points<br>> TDY assignments to Germany and South Korea do not count under the solicitation |
| [redacted] | 50 points for having performance in at least 2 but no more than 4 locations | 50 points<br>> Springfield and McLean, VA are both in Fairfax County (same MSA Code) |
| [redacted] | 50 points for having performance in at least 2 but no more than 4 locations | 50 points<br>> Springfield and McLean, VA are both in Fairfax County (same MSA Code)<br>> TDY assignment to St. Louis does not count under the solicitation |
| [redacted] | 100 points for having performance in 5 or more different locations | 100 points<br>> Ft. Belvoir and McLean, VA are both in Fairfax County (same MSA Code)<br>> TDY assignments to Kuwait, Germany, Ft. Meade, and |

|  |  | Arizona do not count under the solicitation |
|---|---|---|
| [redacted] | 100 points for performance OCONUS | 100 points<br>> TDY assignment to Kuwait and Germany do not count under the solicitation |
| **Total** | 500 points | 500 points |

As noted above, protestor did not have any objections to the contracting officer's affidavit, and at oral argument, protestor's counsel conceded "as to the issue of Octo receiving 250 points in additional [points], I think that issue is somewhat moot now because the Government had came back and found 500 points deducting.  And we agree with their deductions. . . ."

## DISCUSSION

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2014), which governs motions for judgment on the administrative record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Mgmt. and Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims.  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001).  The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision.  See, e.g., Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing to Scanwell Laboratories, Inc. v. Shaffer for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"),

13

reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003). The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2012);[8] see

---

[8] The language of 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;

also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 1312 (Fed. Cir. 2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); Bannum, Inc. v. United States, 404 F.3d at 1351; Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22;  Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v.

---

(C) in  excess  of  statutory  jurisdiction,  authority,  or  limitations,  or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported  by  substantial  evidence  in  a  case  subject  to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

United States, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A).  See COMINT Sys. Corp. v. United States, 700 F.3d at 1381 ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of Title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) and citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also  F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform a meaningful review . . . ."), aff'd on subsequent appeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir.), and dismissed per stipulation sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007).  The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA."  Pension Benefit Guar. Corp. v. LTV

Corp., 496 U.S. 633, 654 (1990).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence.  See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340.  The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law.   To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough."  PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999); see also Turner Const. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

Furthermore, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions.  See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010).  Recognizing the two-step analysis of bid protest cases, the United States Court of Appeals for the Federal Circuit has stated that:

> A bid protest proceeds in two steps.  First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract.  Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process.  See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."  Data General, 78 F.3d at 1562 (citation omitted).  Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error."

Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013) (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Const. Co., Inc. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). ""If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to

substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting <u>Keeton Corrs., Inc. v. United States</u>, 59 Fed. Cl. 753, 755, <u>recons. denied</u>, 60 Fed. Cl. 251 (2004), and <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381)), <u>appeal withdrawn</u>, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. 369, 382 (2013); <u>Alamo Travel Grp., LP v. United States</u>, 108 Fed. Cl. 224, 231 (2012); <u>ManTech Telecomms. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 63 (2001), <u>aff'd</u>, 30 F. App'x 995 (Fed. Cir. 2002); <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985))), <u>appeal dismissed</u>, 6 F. App'x 867 (Fed. Cir 2001), <u>and superseded by regulation as recognized in</u> <u>MVS USA, Inc. v. United States</u>, 111 Fed. Cl. 639 (2013).

   According to the United States Court of Appeals for the Federal Circuit:

   Effective contracting demands broad discretion.  <u>Burroughs Corp.  v. United States</u>, 617 F.2d 590, 598 (Ct. Cl. 1980); <u>Sperry Flight Sys. Div. v. United States</u>, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); <u>see  NKF Eng'g, Inc. v. United States</u>, 805 F.2d 372, 377 (Fed. Cir. 1986); <u>Tidewater Management Servs., Inc. v. United States</u>, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); <u>RADVA Corp. v. United States</u>, 17 Cl. Ct. 812, 819 (1989), <u>aff'd</u>, 914 F.2d 271 (Fed. Cir. 1990).  Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government."  <u>Tidewater Management Servs.</u>, 573 F.2d at 73, 216 Ct. Cl. 69.

<u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d at 958-59; <u>see also</u> <u>Res-Care, Inc. v. United States</u>, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting <u>Tyler Const. Grp. v. United States</u>, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), <u>reh'g en banc denied</u> (Fed. Cir. 2014); <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d at 995; <u>Kingdomware Techs., Inc. v. United States</u>, 107 Fed. Cl. 226, 231 (2012) ("'Federal procurement entities have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation."'" (quoting <u>K-Lak Corp. v. United States</u>, 98 Fed. Cl. 1, 8 (2011) (quoting <u>Tyler Const. Grp. v. United States</u>, 570 F.3d at 1334)), <u>aff'd</u>, 754 F.3d 923 (Fed. Cir. 2014).

   Similarly, the Federal Circuit further has indicated that:

   Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly,

procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).   Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))); Cohen Fin. Servs., Inc. v. United States, 112 Fed. Cl. 153, 162 (2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013).

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals.  See L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 650 (2008) ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."), appeal dismissed, 356 F. App'x 390 (Fed. Cir. 2009); Textron, Inc. v. United States, 74 Fed. Cl. at 286 (in which the court considered technical ranking decisions as "'minutiae of the procurement process'" not to be second guessed by a court (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))).  This is because "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also Unisys Corp. v. United States, 89 Fed. Cl. 126, 142 (2009) (holding that an agency's "exercise of such technical judgment and expertise . . . . is entitled to the greatest possible deference under E.W. Bliss"); CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 717 (2011), aff'd, 475 F. App'x 341 (Fed. Cir. 2012).  The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.   See WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (internal citations omitted))); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir), reh'g denied (Fed. Cir. 2002).

In addition, the court "assume[s] that the government acts in good faith while contracting." Galen Med. Assocs., Inc. v. United States, 56 Fed. Cl. 104, 108 (2003), aff'd, 369 F.3d 1324 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Madison Servs, Inc. v. United States, 92 Fed. Cl. 120, 129 (quoting Aero Corp. v. United States, 38 Fed. Cl. 408, 413 (1997) ("The court's review is thus guided by the "well-established principle that contracting officials are presumed to act in good faith when executing their procurement functions.")), relief from judgment denied, 94 Fed. Cl. 501 (2010).   A protestor must show "'well-nigh irrefragable proof' that the government had an intent to injure it to overcome this presumption." Galen Med. Assocs., Inc. v. United States, 56 Fed. Cl. at 108 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954)); see also Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting. Torncello [v. United States], 681 F.2d [756,] 770 [(1982)]; Librach v. United States, 147 Ct. Cl. 605, 1959 WL 7633 (1959). A contractor can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it. Torncello, 681 F.2d at 770."); Madison Servs, Inc. v. United States, 92 Fed. Cl. at 129.

In Octo's protest, protestor alleges that the "Agency improperly failed to award Octo a contract," because "either the Agency improperly rated its proposal or Octo's original self-assessment was incorrect." Octo calculated it's self-assessment score as 5,875 points.  Upon evaluation of Octo's self-evaluation score, the Agency deducted 100 points from Octo's past performance, lowering Octo's score to 5,775, which placed Octo outside the top 40 proposals eligible for contract award. The February 24, 2014, Unsuccessful Offeror Notification and Post Award Debriefing Letter from the Agency to Octo, however, incorrectly indicated Octo's evaluated score as 5,625[9] and deducted 350 points for past performance.

Following receipt of the debriefing letter, "Octo thoroughly re-examined the documentation submitted with its original proposal and identified areas where either the Agency improperly rated its proposal of [sic] Octo's original self-assessment was incorrect." Octo informed the Agency of its conclusions.  In a March 5, 2014 letter, the agency agreed that the debriefing letter had incorrectly calculated Octo's past performance score, and notified Octo that its corrected evaluated score should be 5,775.

Subsequently, in a March 12, 2014 letter, Octo indicated to the Agency that Octo had again reexamined the documentation submitted with its original proposal and identified areas regarding which its original self-assessment was incorrect, specifically additional mistakes related to Volume 3 of its proposal. Octo identified three new

---

[9] As indicated in the Joint Stipulations of Fact, "[t]he debriefing letter incorrectly asserted a 350 point deduction for Past Performance Project 2. Instead, the deduction for that project should have been 200 points, as indicated by the agency's evaluation of Octo prior to the award."  (internal citation omitted).

changes to its score: a 25 point addition for "Octo Self-Assessment Correction to P2E Project Value," a 50 point deduction for "Octo Self-Assessment Correction to Mission Spaces," and a 275 point addition for "Octo Self-Assessment Correction to Core Disciplines." Therefore, Octo claimed that it should have received an additional 250 points, which would have adjusted Octo's score to 6,025 and, according to protestor, "would be 150 points higher than GSA's minimum threshold for contract awards." The Agency declined to make the adjustments and noted, although it could examine any evaluation adjustments that were made to Octo's self-score as part of a clarification process, an offeror was not permitted to change or amend the proposal documentation submitted unless discussions were conducted. In its complaint, Octo alleges that "[t]he Court should find that Octo is entitled to the additional points, raising Octo's score to 6,025 points," and "[w]ith the additional points, the Court should find that Octo is entitled to award of a contract under the RFP."

In its response to protestor's motion for judgment on the administrative record, defendant argued that:

> Even if GSA committed error by not evaluating Octo's entire proposal, which it did not, Octo cannot establish prejudice. The record reveals that there are additional deductions that GSA could have applied to Octo's proposal totaling 500 points if GSA had reviewed all of Octo's supporting documentation. Even if Octo is entitled to the additional 250 points, which it is not, a 500 point deduction places Octo in 52nd place, well outside the Top 40.

At oral argument, protestor's counsel conceded "as to the issue of Octo receiving 250 points in additional [points], I think that issue is somewhat moot now because the Government had come back and found 500 points deducting.  And we agree with their deductions, which means that even if we were right with our 250 points, we aren't going to be one of the awardees." As indicated in the uncontested, sworn affidavit from Todd Richards, the Lead Evaluator for the Oasis SB procurement, "[a]t the request of counsel for the Government, I conducted an evaluation of Volume Three of Octo Consulting Inc.'s (Octo) proposal, entitled Relevant Experience, for the purpose of determining whether the points that Octo claimed for Relevant Experience were substantiated by documentation."[10] Mr. Richards determined that: "My evaluation of Octo's Relevant Experience, as discussed below, reveals that there are a host of deductions that I would have made, totaling 500 points, due to Octo's claims with respect to having performance in multiple locations and outside the United States (OCONUS) that are not substantiated by documentation."[11]

---

[10] As explained by Mr. Richards, "[p]rior to this request, GSA had not conducted an evaluation of Volume Three (Relevant Experience) because Octo dropped out of the Top 40 following the evaluation of its past performance. Under the solicitation, the evaluation process ceases for offerors who fall out of the Top 40 due to point deductions."

[11] At oral argument, counsel for protestor, again, conceded the 500 points of deductions

Octo concedes that it could not demonstrate prejudice, in other words, protestor could not demonstrate that but for the alleged errors by the Agency, there is a substantial chance it could have received an award.  See Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Bannum, Inc. v. United States, 404 F.3d at 1358.

In its complaint, protestor also argued that

[e]ven if the Agency did properly determine Octo's score, based upon the mistakes that Octo discovered the Agency made in evaluating its proposal, the Agency probably improperly evaluated the proposals of some of the 43 awardees. The evaluation methodology is complex and the self-scoring spreadsheet lacked mathematical checks to prevent offerors and GSA from making errors.

At oral argument, protestor's counsel argued that "based on the complexity of the scoring system, the number of points, the fact that they made mistakes with us, the number of mistakes that offerors made themselves in their self-evaluation," protestor, through its counsel, should have the opportunity to review ten, identified[12] awardees' proposals to check for errors. Protestor's counsel indicated that the ten proposals protestor sought to review would be for awardees who scored towards the bottom of the 43 awardees. The protestor suggested that it would "have a question about whether those could even be awardees," based on "their knowledge of those companies and their belief that those companies couldn't possibly have the capabilities to get the score they got." Moreover, protestor's counsel indicated as grounds for identifying the ten proposals, that for "some of them just because we're not very far off points-wise from them, and we believe that there were mistakes made in doing the evaluation," although protestor's counsel agreed with the court that the foregoing were "all pretty vague accusations."

Although protestor's counsel conceded he could not be sure that mistakes were made with any of the ten identified proposals, and admitted that he had "no specific knowledge" of any mistakes, protestor argued that "we also know that out of the 43 awardees, 15 of them from their self-score had dramatic reductions when the agency looked at it. So, obviously, there was a big difference between what people propose and what the agency found."[13] Protestor's counsel argued that "we know there were

identified by the government, stating: "If we would go forward and they would do that evaluation, I believe that would be correct, yes."

[12] Although protestor's counsel identified by name the ten awardees' proposals to be reviewed, the court does not include the names of those awardees in this opinion.

[13] At oral argument protestor's counsel alleged that "for 15 of the 43 awardees, after their proposal was initially evaluated, they had their scores reduced at least 325 points."

mistakes they made when they [GSA] came back and told us what our score was in the debriefing." At oral argument protestor's counsel summarized his position that "based on the totality of those factors and the probability of there [sic] were mistakes made with us and all of these other things, that there were additional mistakes."

Defendant's counsel argued that "tremendous fairness objections" would be raised if the court were to allow protestor to review the ten identified proposals. Defendant's counsel asserted the awardees "received the solicitation, they presumably followed it, they relied upon the solicitation in submitting their proposals." Defendant's counsel emphasized that to review the proposals, and potentially "redo the evaluation is to act in a way that's inconsistent with the solicitation, with the process that was set forth in the solicitation." Defendant's counsel also asserted that "you don't get to further evaluations and certainly don't get to open up evaluations that have already been completed per the solicitation without acting in a way that's contrary to the solicitation. So, I do think that it would be improper and unfair to offerors who followed the procedures. . . ." Defendant also reiterated that the additional, uncontested deductions identified by Mr. Richards would place protestor well outside the Top 40 proposals eligible for award, which demonstrates protestor cannot establish prejudice.

As protestor has conceded that more than 500 points may have been deducted from its proposal if it were more fully evaluated, the protestor cannot show the requisite prejudice to gain access to ten additional proposals. See Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Bannum, Inc. v. United States, 404 F.3d at 1358. Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. Protestor has not demonstrated any specific allegations that would entitle protestor's counsel to review the ten proposals he identified and sought to review or to conclude that other proposals were incorrectly scored, regarding which the protestor would have the burden of proof. Although protestor's counsel claims that for the ten proposals he identified "those companies couldn't possibly have the capabilities to get the score they got," counsel admits to "no specific knowledge" of any mistakes in the other evaluations by the agency in any of the ten other proposals, making its claims entirely speculative.

In AM General, LLC v. United States, 115 Fed. Cl. 653 (2014), this court determined that speculative allegations by the protestor were insufficient to demonstrate prejudice. Protestor AMG submitted four proposals in response to the solicitation for the design, production and delivery of military vehicles. See id. at 661. After receipt of AMG's third proposal, the agency provided a review to AMG, "in which the agency rated AMG's Factor 3 as Outstanding, with both Subfactors 1 and 2 rated as Outstanding, and Subfactor 3 rated as Acceptable." Id. at 678. AMG alleged that between submitting its third proposal and the submission of its fourth and final proposal, the agency conducted misleading discussions, because in "its review of plaintiff's final proposal, the agency made no change to the ratings of the underlying subfactors, but nonetheless lowered the Factor 3 rating to Good." Id. The court determined that AMG "had the information it needed to improve its proposal on Subfactor 3 well before the submission of its final

proposal, but it managed to effect only modest improvement, and "[i]n any event, plaintiff fails to establish that it was prejudiced by the purported misleading discussions, as it is far too speculative to assume it would have been able to achieve a higher rating." <u>Id.</u> at 679. The court concluded that "AMG's view that it was prejudiced by misleading discussions is much too speculative and thus cannot support a finding that it would have had a substantial chance to receive the contract, but for the improper discussions." <u>Id.</u> at 680. Moreover, in <u>Allied Materials & Equipment, Co. v. United States</u>, a Judge of this court noted that "[i]n addition to demonstrating a violation of regulation or procedure, to prevail in its bid protest in the circumstances of this case, plaintiff must demonstrate that, absent the error, it would have had a chance of receiving the contract award that is more than merely speculative." <u>Allied Materials & Equip., Co. v. United States</u>, 81 Fed. Cl. 448, 460 (2008) (applying "a standard for the showing of prejudice that lies between <u>Weeks Marine [v. United States]</u>, 79 Fed. Cl. [22,] 35 [(2007), <u>aff'd in part</u>, <u>rev'd in part</u>, 575 F.3d 1352 (Fed. Cir. 2009)] (the identification of 'a non-trivial competitive injury capable of being redressed by judicial relief') and <u>Bannum [v. United States]</u>, 404 F.3d at 1353 (the 'substantial chance' test)"). The court notes that when examining the review by the agency, "[t]he court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" <u>BCPeabody Constr. Servs., Inc. v. United States</u>, 112 Fed. Cl. at 508 (quoting <u>Keeton Corrs., Inc. v. United States</u>, 59 Fed. Cl. at 755, and <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381). <u>See also</u> <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. at 382; <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. at 743-44)).

Although not specifically alleged in protestor's complaint, Octo briefly alleges that the "Agency failed to consider Octo's price when making award decisions" in its motion for judgment on the administrative record. At oral argument, the protestor also stated that in the Solicitation, "the agency says they're going to do a best value continuum, and they cite FAR 15.101. FAR 15.101 is a best value continuum." Therefore, protestor argued there is an inconsistency in not evaluating Octo's price. As articulated by protestor's counsel, "[t]he inconsistency is once they put FAR 15.101 in, you have to also -- you know, price has to become a determining factor, by the language in FAR 15.101."

Although it is not clear, as demonstrated above, that Octo could demonstrate the requisite prejudice in order to prevail, the court, nevertheless, examines Octo's price/best value allegation. As noted above, that a contracting officer is afforded broad discretion and deference by the courts extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. <u>See</u> <u>E.W. Bliss Co. v. United States</u>, 77 F.3d at 449; <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. at 392. The amount of discretion afforded the contracting officer is greater in some circumstances as compared to others. For example, in a negotiated procurement, contracting officers are generally afforded greater decision

making discretion, in comparison to their role in sealed bid procurements.  See Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("The protestor's burden is greater in negotiated procurement, as here, than in other types of bid protests because ""the contracting officer is entrusted with a relatively high degree of discretion."'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (quoting Burroughs Corp. v. United States, 223 Ct. Cl. 597-98, 617 F.2d 590, 597 (1980)))); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." (citations omitted)); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002) ("Moreover, in a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations."), reh'g en banc denied (Fed. Cir.), cert. denied, 540 U.S. 937 (2003).

The Federal Circuit has explained that procurement officials have an even greater degree of discretion when it comes to best-value determinations, as compared to deciding on price alone.  See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); AM Gen., LLC v. United States, 115 Fed. Cl. 653, 697 (2014); Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).[14]

---

[14] Although the Agency did not conduct negotiations with the offerors to the Solicitation, protestor acknowledges that the Solicitation was a negotiated procurement.  In its motion for judgment on the administrative record, protestor, citing Galen Medical Associates, Inc. v. United States, 369 F.3d at 1330, states, "in a negotiated procurement like this one, where there are best-value determinations, procurement officials are afforded a great deal of discretion, as compared to deciding on price alone."

In <u>E.W. Bliss Co. v. United States</u>, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in best value determinations:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government.  See <u>Lockheed Missiles & Space Co., Inc. v. Bentsen</u>, 4 F.3d 955, 958 (Fed. Cir. 1993); <u>cf.</u> <u>Widnall v. B3H</u>, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); <u>In re General Offshore Corp.</u>, B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award.  Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).
>
> . . .
>
> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess.  See <u>Lockheed Missiles & Space Co.</u>, 4 F.3d at 958; <u>Grumman Data Systems Corp. v. Widnall</u>, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.").

<u>E.W. Bliss Co. v. United States</u>, 77 F.3d at 449; <u>see also</u> <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. at 780; <u>Galen Med. Assocs., Inc. v. United States</u>, 74 Fed. Cl. 377, 383-84 (2006); <u>JWK Int'l Corp. v. United States</u>, 49 Fed. Cl. at 388.

When the contracting officer's discretion grows, so does the burden on the protestor to overturn the contracting officer's decisions.  As noted in <u>D & S Consultants, Inc. v. United States</u>:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer.  <u>DynCorp Int'l v. United States</u>, 76 Fed. Cl. 528, 537 (2007).   Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. <u>Id.</u>   Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." <u>Id.</u>

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)).  "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28; E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 125 (2010) (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("An agency's contract award is thus least vulnerable to challenge when based upon a best value determination."))); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

As indicated in the Joint Stipulations of Fact: "The source selection process for OASIS SB was based upon achieving best value by determining the Highest Technically Rated offerors with a Fair and Reasonable Price." The Solicitation's "BASIS FOR AWARDS," (capitalization in original) indicated that

> [t]he source selection process on OASIS SB will neither be based on the Lowest Price Technically Acceptable (LPTA) nor Tradeoffs. Within the best value continuum, FAR 15.101 defines best value as using any one or a combination of source selection approaches. For OASIS SB, the best value basis for awards will be determined by the Highest Technically Rated Offerors with a Fair and Reasonable Price.
>
> The Highest Technically Rated, Fair and Reasonable Price approach will best achieve the objective of awarding contracts to Offerors of varying core expertise in a variety of professional services disciplines with qualities that are most important to GSA and our customers, such as Past Performance, Relevant Experience, and Systems, Certifications, and Clearances.

The Source Selection Plan expanded on the Solicitation's "BASIS FOR AWARDS," (capitalization in original) and explained that:

> Work to be performed under OASIS SB are articulated and awarded by federal customers at the task order level. As a result, non-price factors like Past Performance, Relevant Experience, and Systems, Certifications, and Clearances play a dominant role in the basis for the OASIS SB awards. Accordingly, the source selection process will neither be based on the Lowest Price Technically Acceptable (LPTA) or Tradeoffs. The LPTA approach is in direct contrast and detrimental to obtaining the quality and expertise of professional service employees needed for successful task order performance across the federal Government for a variety of integrated professional services for <u>all</u> contract types and pricing. Tradeoffs allow for a subjective analysis to consider awards to other than the lowest priced Offeror or other than the highest technically rated Offeror, however, this subjective approach is better suited for single award contracts or task orders when risks associated with the actual work to be performed and actual prices to be paid are being analyzed. Furthermore, in a tradeoff scenario, you can't predetermine a number of awards because you don't know in advance where the logical trade-offs will occur.

> Given the breadth and depth of OASIS SB a more "Objective" approach rather than a "Subjective" approach will be used for the basis of awards, focusing primarily on the non-price factors. Within the best value continuum, FAR 15.101 defines best value as using any one or a "combination" of source selection approaches. As the best value continuum points out, technical capability becomes a more dominant factor in procurements where the requirement is not definitive and contract type and pricing is accomplished at the task order level.

> *For OASIS SB, the best value basis for award will be determined by the Highest Technically Rated (HTR) Offerors with Fair and Reasonable Pricing.*

(emphasis in original).

Best value is addressed in FAR 15.100 <u>et</u> <u>seq.</u>  FAR 15.101 (2013) states that:

> An agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches. In different types of acquisitions, the relative importance of cost or price may vary. For example, in acquisitions where the requirement is clearly definable and the risk of unsuccessful contract performance is minimal, cost or price may play a dominant role in source selection. The less definitive the requirement, the more development work required, or the greater the performance risk, the more technical or past performance considerations

may play a dominant role in source selection.

FAR 15.101; see also Linc Gov't Serv., LLC v. United States, 96 Fed. Cl. 672, 683 n.6 (2010); Info. Scis. Corp. v. United States, 86 Fed. Cl. at 286.

In its motion for judgment on the administrative record, Octo emphasizes that the Agency failed to consider Octo's price when making award decisions. At oral argument, defendant's counsel argued that "[o]ur position is that neither Octo nor any other offerors is entitled to -- once they get knocked out of the top 40 -- have any evaluation done of their proposal."

Notably, protestor does not argue that the Agency did not follow the language or criteria of the Solicitation in its evaluation of the submitted proposals. The Solicitation and the Source Selection Plan made clear how the Agency intended to conduct the evaluation.[15] Moreover, protestor does not argue that the Agency failed to consider price at all, when evaluating the proposals during the initial evaluation stage just that the Agency failed to consider price for protestor's proposal.  The Agency, faced with a large number of awards to make, and anticipating a large number of offers,[16] announced to all that the self-evaluation and two-step process would be utilized. It allowed for the offerors to submit a self-scoring worksheet, which the evaluation team reviewed and verified that supporting documentation exists for all evaluation elements. As described in the Solicitation, the evaluation team would "verify that Top 40 awards for Pools 1,2,3,4, and 6 and the Top 20 awards for Pools 5.A. and 5.B. have successfully passed all of the Acceptability Review requirements in Section M.4. of the solicitation." (emphasis in original). The Solicitation made clear, and Octo has not challenged, that only offerors whose self-evaluated scores were in the Top 40, were subject to the Acceptability Review, which required that all the requested proposal submission information be current, accurate, and complete.  Nor does Octo disagree that the source selection process was based upon achieving best value by determining the Highest Technically Rated offerors with a Fair and Reasonable Price, or that the Agency did not follow that approach.

The Solicitation also required that

Any Offeror in the Top 40 and/or Top 20 based upon score, who fails any of the criteria listed in the Acceptability Review in Section M.4., will be removed from consideration for award and notified, in writing, as soon as

_____

[15] The court at oral argument noted that the self-evaluation approach used by the agency was the one "they announced to everybody.  That's what everybody consented to utilize."

[16] As noted above, the Agency received 330 proposals and there were 125 awardees for all seven Pools.

practicable. The next highest rated Offeror(s) (based upon score) who passes the Acceptability Review shall be added in the eliminated Offerors place. Only Offerors who initially pass all the criteria in the Acceptability Review in a given Pool in accordance with Section M.4. shall be considered eligible for award.

Following the Acceptability Review screening, the evaluation team will then evaluate and verify the support documentation for each and every evaluation element that the Top 40 and/or Top 20 have stated in the Offeror's proposal checklist (Section J.4.) and self scoring worksheet (See Section J.5A.)

In the event that an evaluation element claimed is unsubstantiated or otherwise not given credit for, the Offeror's preliminary score shall have the point value of the refuted evaluation element deducted and the Offeror will be re-sorted based upon the revised preliminary score. If the Offeror remains in the Top 40 and/or Top 20 the evaluation of the offer shall continue. If the Offeror does not remain in the Top 40 and/or Top 20, the next highest rated Offeror (based upon score) who passes the Acceptability Review shall be added to the Top 40 and/or Top 20 and evaluation shall begin on that offer.

The above quoted language demonstrates that for an offeror whose proposal was in the Top 40, but whose self-evaluation was unsupported, the points associated with the unsupported evaluation would be deducted and the proposal would be re-sorted based upon the revised preliminary score.  If the proposal was no longer in the Top 40, the evaluation of the proposal would cease. It is at this stage of the evaluation that Octo was eliminated from the Top 40 due to its unsupported past performance.  Notably, in its complaint Octo did not allege that the Agency failed to consider its price, merely that the evaluation of its past performance was incorrect and resulted in Octo being outside the Top 40 offerors. Protestor does not argue that the Agency acted beyond its discretion to limit the scope of acceptable offers which would pass on to the phase two evaluation.

As indicated in FAR 15.306(c):

(1) Agencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range. Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section.

(2) After evaluating all proposals in accordance with 15.305(a) and paragraph (c)(1) of this section, the contracting officer may determine that the number of most highly rated proposals that might otherwise be

included in the competitive range exceeds the number at which an
efficient competition can be conducted. Provided the solicitation notifies
offerors that the competitive range can be limited for purposes of
efficiency (see 52.215–1(f)(4)), the contracting officer may limit the
number of proposals in the competitive range to the greatest number that
will permit an efficient competition among the most highly rated proposals
(10 U.S.C. [§] 2305(b)(4) and 41 U.S.C. [§] 3703).

(3) If the contracting officer, after complying with paragraph (d)(3) of this
section, decides that an offeror's proposal should no longer be included in
the competitive range, the proposal shall be eliminated from consideration
for award. Written notice of this decision shall be provided to unsuccessful
offerors in accordance with 15.503.

(4) Offerors excluded or otherwise eliminated from the competitive range
may request a debriefing (see 15.505 and 15.506).

FAR 15.306(c) (2013) (as amended by 79 Fed. Reg. 24201 (May 29, 2014)); see also
CMI Mgmt., Inc. v. United States, 115 Fed. Cl. 276, 288 (2014) ("The Federal
Acquisition Regulations describe when a CO [Contracting Officer] may limit the number
of proposals in the competitive range.").

     The Agency determined that only the Top 40 offerors should be evaluated for the
Acceptability Review, and only the Top 40 evaluated scores after the initial evaluation
would be evaluated for price.  The Agency, therefore, established a competitive range of
proposals for each Pool and excluded all other offerors who did not have a sufficient,
evaluated, self-score.[17] As noted by defendant, "[th]e Government did not consider
Octo's price because, under the solicitation, only the offerors who are in the Top 40,
based upon their technical score, and remain in the Top 40 following the completion of
the validation and evaluation process, have their prices evaluated. Because Octo was
not one of the Highest Technically Rated, GSA properly declined to consider Octo's
price." (internal citation omitted).

     The Agency, moreover, was not obligated to examine the price of each offeror.
See Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 234 (2012) ("Price must
be considered without exception when an award is made, it need not be considered for
proposals that are technically unacceptable.").  As the court in Alamo Travel noted:

     the GAO has consistently found that an agency can exclude a technically
     unacceptable proposal from the competitive range without considering

---

[17] As noted above, the Joint Stipulations of Fact indicated that for Pool 3 "[t]he
awardees consisted of the Top 40 and three companies which were included as
awardees due to their socio-economic status."

price. <u>Ocean Services, LLC</u>, B–406087.2, 2012 CPD ¶ 62, 2012 WL 423603 at *4 (Comp. Gen. Feb. 2, 2012) (citations omitted); <u>see</u> <u>also</u> <u>TMC Design Corporation</u>, B–296194.3, 2005 CPD ¶ 158, 2005 WL 2108084 at *4 (Comp. Gen. Aug. 10[,] 2005). This has also been recognized by our court. <u>Bean Stuyvesant, L.L.C. v. United States</u>, 48 Fed. Cl. 303, 338 (2000) (explaining that "an agency may not exclude a technically acceptable proposal from the competitive range without taking into account the relative cost of that proposal to the government" (emphasis added)) (citing <u>Meridian Management Corp.</u>, B–285127, 2000 CPD ¶ 121, 2000 WL 1097129 at *3 (July 19, 2000)); <u>Femme Comp Inc. v. United States</u>, 83 Fed. Cl. 704, 731 (2008).

<u>Alamo Travel Grp., LP v. United States</u>, 108 Fed. Cl. at 234.  The Agency, therefore, was not arbitrary and capricious for not considering Octo's price.

In its motion for judgment on the administrative record, Octo argues "[h]ere is [sic] clear that the procurement was still supposed to be conducted under part 15 of FAR, although it is unclear exactly how since the RFP states that the source selection process 'will neither be based upon the Lowest Price Technically Acceptable nor Tradeoffs.['] [sic]" Protestor argues that

FAR 15.101 does provide that an agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches, noting that in different types of acquisitions, ["] [sic] the relative importance of cost or price may vary." FAR 15.101. But in all of the examples given in the FAR, price is still a determining factor for contract award. In some, where the requirement is clearly definable and the risk of unsuccessful contract performance is minimal, cost or price may play a dominant role in source selection, and in others, when there is a less definitive the [sic] requirement, the more development work required, or the greater the performance risk, the more technical or past performance considerations may play a dominant role in source selection. Again though, price is still considered.

In response, defendant, quoting FAR 15.101, notes that "Octo's argument ignores the plain language of FAR 15.101, which states that 'to obtain best value, agencies are given broad discretion to employ *one or a combination of source selection approaches*, depending on the nature of the requirements, relative importance of cost or price, and other factors.' Reference to a 'combination of source selection approaches' implies that there are more source selection approaches that are acceptable under the FAR than the two approaches expressly referenced in FAR 15.101."[18] (emphasis in original). At oral argument, protestor's counsel conceded that the language of FAR 15.101 is "very

_____

[18]  FAR 15.101-1 (2013) specifically addresses the "Tradeoff process," and FAR 15.101-2 (2013) specifically addresses the "Lowest price technically acceptable source selection process."

general." Therefore, the Agency complied with its obligations under FAR 15.101 for its evaluation of all the evaluated Top 40 proposals.  As noted in the Solicitation:

> Once the Top 40 and/or Top 20 highest scored offers have been evaluated and validated, the evaluation team will then check to verify that these Offerors have proposed fair and reasonable pricing. In the event that an Offeror has not provided fair and reasonable pricing, the Offeror shall be eliminated from further consideration for award unless discussions are conducted.

To the extent that the Agency did not consider Octo's price, Octo already had been eliminated from consideration.  It would have been arbitrary and capricious for the Agency to have considered Octo's price, as the Agency would have ignored the evaluation format announced in the Solicitation.[19] Moreover, as protestor's counsel conceded at oral argument, based on the review by Mr. Richards, even if the Evaluation Team and an Acceptability Review had conducted a full evaluation of Octo's proposal, Octo's proposal would not have been among the Top 40 proposals.

Furthermore, unlike protestor's general challenge that mistakes were most likely made to the self-evaluation scores of the other offerors, protestor does not allege that the Agency did not consider the price for the eventual awardees.  Even if protestor had made such a claim, as discussed above, the deference for the Agency's best value determinations is even higher than the standard deference afforded to procurement officials.  See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); AM Gen., LLC v. United States, 115 Fed. Cl. at 697; Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. at 110.

At oral argument, protestor's counsel repeatedly cited to the decision in Serco Inc. v. United States, 81 Fed. Cl. 463, for the proposition that it was arbitrary and capricious for the agency to eliminate Octo without consideration of Octo's price.  In a post-argument submission, the protestor emphasized that, "[a]s forcefully explained in Serco, price must always be an important or significant factor in the evaluation for a negotiated procurement, with a price analysis not satisfying this requirement as it is different than the consideration of prices in making award decisions."  Protestor argued: "Thus, per the law in Serco, because the procurement is under FAR part 15 price must be a significant factor in the evaluation process. Stated another way, price must be a determinative factor in the award decision," and in a negotiation procurement, "[t]here are no cases that hold otherwise nor any cases where GAO or a court has found a

---

[19] Although defendant argues "Octo's belated challenge to that source selection approach is a challenge to the solicitation, which has been waived because Octo could have brought it pre-award," citing COMINT Systems v. United States, 700 F.3d at 1381, the court does not need to reach the issue of waiver as the Agency complied with the terms of the Solicitation and the applicable regulations.

procurement with an evaluation scheme of Highest Technically Rated Offers with a Fair and Reasonable Price to be legal." The court notes, however, that protestor does not cite to any cases, either in this court, or at the GAO, in which an evaluation scheme of Highest Technically Rated Offers with a Fair and Reasonable Price is held to be per se improper.

In Serco, at issue was "a government-wide acquisition contract (GWAC) awarded by the General Services Administration (GSA) to provide technology products and services to the entire Federal government. Sixty-two offerors competed for a chance to perform task orders under this GWAC." Id. at 465 (footnote omitted). Eight unsuccessful offerors filed suit in the Court of Federal Claims, protesting GSA's decisions. See id. The court explained that, "[i]n ranking the technical proposals of these offerors, GSA teams assigned adjectival ratings to various subfactors and then converted them into whole numbers (e.g., 3, 4, 5). Combining, averaging and weighting these figures, the agency ended up with technical scores that were carried out to three decimal points (e.g., 3.817)—and it made critical distinctions among the sixty-two offerors based upon the thousandths of a point." Id. The court noted, however,

> [b]ased upon these technical scores, twenty-eight contractors were designated by the agency as "presumptive awardees." GSA then purported to conduct price reasonableness and tradeoff analyses to take into account price—but, conspicuously, none of these comparisons resulted in any of the "presumptive awardees" being displaced by a lower-priced offeror. Indeed, GSA ultimately made awards to offerors whose prices were 59th, 60th and 61st out of the sixty-two offers—prices that the agency claims were "fair and reasonable" despite being twice as high as the lowest winning offer, as much as thirty percent higher than the independent government cost estimate, and more than two standard deviations to the mean of the evaluated prices for all the offerors.

Id. The Serco court concluded: "GSA, in attaching talismanic significance to technical calculations that suffer from false precision, made distinctions that, in their own right, likely were arbitrary, capricious and contrary to law, but certainly became so when the agency failed adequately to account for price and to make appropriate tradeoff decisions." Id. The court found, therefore, that the plaintiffs were prejudiced and injunctive relief was warranted. See id. at 503.

Quoting from Serco, Octo contends that "'[t]he statutory requirement that cost to the government be considered in the evaluation and selection of proposals for award is not satisfied by the promise that cost or price will be considered later, during the award of individual task orders.'" Defendant, quoting Serco v. United States, 81 Fed. Cl. at 492, correctly notes that "the Court's entire discussion in Serco of whether 'GSA adequately consider[ed] price in making the award decisions' has no bearing on the OASIS SB procurement because the source selection approach in Serco prevented the Government from excluding offerors solely on technical grounds, which meant that the prices of all offerors had to be considered." (modification in original). Defendant notes

that in contrast to what occurred in <u>Serco</u>, the Solicitation in the above-captioned case, "expressly required the Government to exclude offerors on technical grounds; thereby, denying a price evaluation to those offerors who failed to meet the technical threshold" during the initial evaluation stage. (internal citation omitted).

Protestor also cites to <u>Serco</u> for the proposition that "price must be a determinative factor in making an award decision in a negotiated procurement." As noted above, in <u>Serco</u>, GSA, the same procuring agency as in the above captioned protest, applied a best-value, tradeoff decision. The <u>Serco</u> court noted that the applicable process for a best-value tradeoff process is FAR 15.101-1. <u>See</u> <u>Serco v. United States</u>, 81 Fed. Cl. at 496. In determining that the tradeoff analysis was flawed, the <u>Serco</u> court noted that "most of the relevant tradeoff decisions made in the source selection process here were materially flawed. The tradeoff analysis was deficient, first, because, in most instances, 'it failed to indicate whether the government would receive benefits commensurate with the price premium it proposed to pay.'" <u>Id.</u> at 498 (quoting <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d at 959-60). Therefore, the <u>Serco</u> court determined, "[a]bsent a more detailed rationale, there is simply no way for this court to determine whether the agency, in fact, conducted a tradeoff analysis that adequately reflected price and was not arbitrary." <u>Id.</u>

In the protest currently before the court, defendant argues that:

In <u>Serco</u>, the source selection methodology, unlike here, required the Government to conduct a tradeoff analysis, in which price and technical considerations are counterbalanced. [<u>Serco v. United States</u>,] 81 Fed. Cl. at 466. Thus, the solicitation in <u>Serco</u> did not require the Government to exclude offerors from further consideration if they failed to meet a technical threshold. Indeed, such an approach would be inconsistent with a tradeoff analysis.

The court agrees with defendant that had the Solicitation called for a traditional trade-off analysis, it could have been arbitrary and capricious not to consider price, but because the Solicitation was clear that it was evaluated for Highest Technically Rated Offerors with Fair and Reasonable Pricing, the Agency did not err and the reasoning in the <u>Serco</u> decision is not applicable to the Solicitation at issue before this court. Moreover, the court notes even if the facts of this protest were comparable to the facts in <u>Serco</u>, this court would not be bound by the <u>Serco</u> decision. <u>See</u> <u>Adams v. United States</u>, 99 Fed. Cl. 700, 709 (2011) (quoting <u>Buser v. United States</u>, 85 Fed. Cl. 248, 259 n.12 (2009) ("'[T]he court is not bound by other decisions in the Court of Federal Claims[.]' ")); <u>see also</u> <u>Reidell v. United States</u>, 47 Fed. Cl. 209, 212 (2000) ("A decision here is not binding on other judges in this same court." (citation omitted)).

**CONCLUSION**

As previously communicated to the parties, and as determined above, protestor was not able to demonstrate prejudice to warrant injunctive relief. Moreover, protestor has not demonstrated that the Agency improperly failed to evaluate protestor's price in its best value analysis. As a result, protestor's motion for judgment on the administrative record is **DENIED**. Protestor's complaint is **DISMISSED**. The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**